**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 26 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CITY OF STILWELL, OKLAHOMA, a municipal corporation,

    Plaintiff-Appellee,

v.

OZARKS RURAL ELECTRIC COOPERATIVE CORPORATION,

    Defendant-Appellant,

and

RURAL ELECTRIC COMPANY, United States of America (ex rel.); NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION,

    Defendants.

No. 97-7104

---

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 94-CV-293-S)**

---

Lloyd E. Cole, Jr., Stilwell, Oklahoma, for Plaintiff-Appellee.

Patrick D. Shore (John R. Eldridge, III of Burke & Eldridge, P.A., Fayetteville, Arkansas, with him on the briefs) of Derryberry, Quigley, Solomon & Naifeh, Oklahoma City, Oklahoma, for Defendant-Appellant.

Before **BRORBY, BARRETT** and **EBEL**, Circuit Judges.

---

**BRORBY**, Circuit Judge.

---

This appeal involves a dispute over the calculation of just compensation in a condemnation proceeding under Oklahoma law, and whether the commissioners appointed by the district court and charged with calculating damages qualify as "disinterested" parties. Appellee, the City of Stilwell, Oklahoma, seeks to condemn certain electric distribution facilities of Appellant, Ozarks Electric Cooperative Corporation ("Ozarks"), located within newly annexed portions of the City of Stilwell. Ozarks, a rural electric power distribution cooperative, appeals the district court's order confirming the Commissioners' Report establishing damages the City of Stilwell must pay Ozarks for the condemned facilities. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, and affirm.

BACKGROUND

The City of Stilwell, located in Adair County, Oklahoma, owns and operates a municipal electric utility providing service to customers within and outside the corporate limits. The city recently expanded its corporate limits to encompass territory initially served and developed by Ozarks. Under authority of Okla. Stat. tit. 18, § 437.2(k), the City of Stilwell sought to condemn Ozarks'

facilities and commence operation of its municipal electrical utility within the newly-annexed territory. The Oklahoma statute allows municipalities owning and operating electric service utilities to condemn the facilities of rural electric cooperatives operating within the boundaries of the municipality upon payment of fair value. [1] Since the parties could not agree on the amount the city should pay for Ozarks' facilities, the City of Stilwell commenced this action in Adair County, Oklahoma, for a judicial determination of just compensation. *See* Okla.

---

[1] Okla. Stat. tit. 18, § 437.2(k) states if a:

city, town or village ... owns and operates a system for the furnishing of electric energy to its inhabitants, the cooperative furnishing electric energy in such area shall transfer to such city, town or village, upon its request, the cooperative's electric distribution facilities used in furnishing electric energy in said area, other than facilities used in furnishing electric energy for resale or to premises of the cooperative, subject, however, to the following requirement: The city, town or village shall pay to the cooperative an amount to compensate the cooperative for the fair value of the cooperative's facilities to be acquired by the city, town or village. If such cooperative and city, town or village cannot agree upon the amount to be paid to the cooperative, the city, town or village is authorized to file a proceeding in the district court of the county in which such city, town or village, or any part thereof, is located, for the acquisition of the cooperative's electric distribution facilities used in furnishing electric energy in said area, other than facilities used in furnishing electric energy for resale or to premises of the cooperative, and the procedure followed and the method of ascertaining just compensation to be paid the cooperative will be as provided in Article 2, Section 24, of the Oklahoma Constitution and Sections 53 to 58, inclusive, of Title 66 of the Oklahoma Statutes.

Const., Art. II, § 24; Okla. Stat. tit. 66, §§ 53 through 58. The case was later removed to the United States District Court for the Eastern District of Oklahoma, after the City of Stilwell joined the Rural Electrification Administration [2] and the National Rural Utilities Cooperative Finance Corporation as parties to the lawsuit. [3]

Following removal, Ozarks filed a motion for summary judgment. The district court granted the motion, finding federal law preempted the City of Stilwell's proposed condemnation of Ozarks' facilities because it would frustrate the purpose of the Rural Electrification Act, 7 U.S.C. § 901, *et seq*. *See City of Stilwell v. Ozarks Rural Elec. Coop. Corp*., 870 F. Supp. 1025 (E.D. Okla. 1994). This court later reversed the district court's ruling in *City of Stilwell v. Ozarks Rural Elec. Coop. Corp*., 79 F.3d 1038 (10th Cir. 1996), applying a narrow reading to the Rural Electrification Act, and finding no clear federal preemption of the states' traditional authority under the police power to regulate utilities. *Id.*

---

[2] The Rural Electrification Administration is now known as the Rural Utilities Service.

[3] The Rural Electrification Administration and National Rural Utilities Cooperative Finance Corporation provide financing and other services to rural electric cooperatives. Both of these entities are secured creditors of Ozarks, holding mortgage interests in its facilities.

at 1044.

After this court remanded the case, the district court continued the condemnation proceedings. It appointed commissioners and instructed them to determine the amount the City of Stilwell owed to Ozarks in damages for the condemnation of its facilities. After completing their analysis, the commissioners filed a report on February 18, 1997, recommending Ozarks receive $1,515,000 as just compensation for the taking. This figure included $170,000 for facilities, $1,200,000 in lost revenue, $26,000 for stranded costs, and $119,000 for reintegration expenses. The commissioners included no amounts for either the value of the territory or the going concern value of the facilities. Ozarks subsequently filed objections to the Commissioners' Report, and the district court held an evidentiary hearing on the matter. Following the hearing, the district court issued an order denying Ozarks' objections and confirming the Commissioners' Report. Although Oklahoma law entitled Ozarks to a jury trial on the issue of damages, the district court denied Ozarks' request as untimely. However, Ozarks does not contest the denial of a jury trial, only the district court's confirmation of the Commissioners' Report.

Ozarks argues that in approving and adopting the Commissioners' Report,

the district court erred in several ways. First, it contends the commissioners appointed by the court to calculate just compensation are not "disinterested" as required under Oklahoma law. *See* Okla. Const. Art. II, § 24; Okla. Stat. tit. 66, § 53(A). It argues the district court erred in not utilizing the procedures under Rule 71A(k) of the Federal Rules of Civil Procedure calling for election or selection of commissioners. Second, Ozarks alleges the commissioners' calculation of damages fails to properly assess reintegration costs because the court should require the City of Stilwell to condemn all Ozarks' facilities within the city limits. Finally, Ozarks challenges the Commissioners' Report for failing to include the value of future revenue streams, "going concern" and lost service territory, and revenue losses of KAMO Electric Cooperative (KAMO) – Ozarks' power supplier. [4]

For purposes of our review, we treat the district court's order confirming the Commissioners' Report as we would a judgment sustaining a jury verdict. *See United States v. Wallace*, 201 F.2d 65, 67 (10th Cir. 1952) (finding commissioners appointed under federal law to determine just compensation in a

---

[4] In its brief, Ozarks claims the commissioners failed to follow the calculation method and manner prescribed by the district court but does not elaborate further. We will not address a conclusory allegation without further support. An issue listed but not argued is waived. *See Abercrombie v. City of Catoosa*, 896 F.2d 1228, 1231 (10th Cir. 1990).

condemnation proceeding, serve the function of a jury because the proceeding before the commissioners is quasi-judicial in nature).  In the context of this diversity action, Oklahoma law controls the substantive issues involved.  *Barrett v. Tallon*, 30 F.3d 1296, 1300 (10th Cir. 1994) (ruling federal courts sitting in diversity should apply the substantive law of the forum state, including choice of law rules).

<u>Appointment of the Commissioners</u>

The district court appointed commissioners to assess damages for the City of Stilwell's taking of Ozarks' electric distribution facilities because the parties could not agree on a fair price for the transfer. [5]  In situations where the parties cannot agree, Oklahoma law calls for a calculation of just compensation by a board of at least three "disinterested freeholders" selected from the regular jury list as prescribed by the legislature.  Okla. Const. Art. II, § 24; Okla. Stat. tit. 66, § 53(A).  In conformity with the state law procedures, the district court appointed three commissioners to make the appraisal.  Each of the commissioners the court

---

[5] The City of Stilwell is "authorized to file a proceeding in the district court of the county" for the determination of just compensation under the method and procedures outlined in Okla. Const. Art. II, § 24 and Okla. Stat. tit. 66, §§ 53 through 58.  Okla. Stat. tit. 18, § 437.2(k).  The constitutional and statutory provisions cross-referenced in § 437.2(k) govern the appointment of commissioners.

selected resided in Adair County, received electric service from Ozarks, and was considered an owner-member of Ozarks Electric Cooperative Corporation. [6] Additionally, two of the commissioners also had indirect ties to the City of Stilwell Electric Utility. One worked as a manager of a bank in the City of Stilwell, which received its electric service from the city, and the other owned rental property in the City of Stilwell, which also received electric service from the City of Stilwell Electric Utility.

Ozarks argues the district court improperly appointed commissioners from among the residents of Adair County because virtually every resident in the county is either an owner-member of Ozarks or a customer of the City of Stilwell Electric Utility with a pecuniary interest in the outcome of the appraisal. According to Ozarks, this pecuniary interest in the outcome of the damages calculation requires the court to presume bias and disqualify the commissioners.

We agree with Ozarks that bias or prejudice is often an elusive condition

---

[6] The term "owner-member" is somewhat misleading in this instance. On its face, it implies the owner-member holds some substantial interest in the financial success of the cooperative. However, in this case, the term "owner-member" merely designates a customer of the cooperative. As owner-members of Ozarks, the commissioners received no dividend income or share of profits.

of the mind, and the law sometimes requires a presumption of partiality – even in the absence of actual proof – if the mere potential for a conflict of interest exists. Nevertheless, the decision to apply this presumption remains within the discretion of the court. *See Gonzales v. Thomas*, 99 F.3d 978, 987 (10th Cir. 1996) (applying this proposition in the context of juror selection), *cert. denied*, 117 S. Ct. 1342 (1997). We find – in the context of selecting commissioners – the court's decision about whether implied bias exists should turn on an objective legal evaluation of the challenged commissioners' "experiences and their relation to the case." *Id*. (citation omitted). The district court must determine whether the commissioners "may have such a close connection to the circumstances at hand that bias must be presumed." *Id*. Accordingly, we will not disturb the court's appointments absent some evidence of error causing harm to Ozarks.

Our review of the law and the record leaves us unpersuaded that the court abused its discretion in appointing the commissioners. We do not interpret Oklahoma law to require the commissioners to possess the level of complete and absolute impartiality Ozarks claims. Such an inflexible interpretation of the statute would disqualify virtually every person in Adair County from serving as a commissioner merely because of his or her status as either a customer of the City of Stilwell Electric Utility or owner-member of Ozarks. This is an unnecessary

conclusion. In the context of jury selection, a situation analogous to the selection of commissioners, [7] we do not automatically exclude a juror simply because he holds an opinion on a particular subject or knows something about the case. *See Irvin v. Dowd*, 366 U.S. 717, 722-23 (1961) (finding in a world of "widespread and diverse methods of communication," courts need not require that jurors be totally ignorant of the facts involved in the case, nor lack preconceived notions about the proper outcome); *Brecheen v. Reynolds*, 41 F.3d 1343, 1351 (10th Cir. 1994), *cert. denied*, 515 U.S. 1135 (1995). Instead, the goal of our system is to find a juror who "can lay aside his impression or opinion and render a verdict based on the evidence presented." *Irvin,* 366 U.S. at 723. The court asked the commissioners to perform a task, which they swore an oath to execute "impartially and justly" under Okla. Stat. tit. 66, § 53(C). We assume, absent compelling evidence to the contrary, the commissioners faithfully performed their task and acted without personal bias or improper motivation.

Additionally, even if we found the commissioners held an "interest" in this

---

[7] For the purpose of our discussion of this issue, we assess the qualifications and competency of the commissioners under the standards applied to jurors because we believe the basic principles governing the impartiality of jurors are equally applicable to the district court's appointment of "disinterested" commissioners.

proceeding, it is so tenuous that the district court did not abuse its discretion in refusing to imply any bias. Even reading the record most favorably to Ozarks' position, we find the commissioners' assessment in the condemnation proceeding will only modestly affect the rates Ozarks and the City of Stilwell charge their customers for electric service. Since Ozarks' basis for alleging prejudice is so attenuated, the presumption of bias is unnecessary. *See, e.g., Smith v. Phillips*, 455 U.S. 209, 221-22 (1982) (O'Connor, J., concurring) (finding implied bias appropriate only in extreme and exceptional situations where a party is subjected to "manifestly unjust procedures resulting in a miscarriage of justice"); *United States v. Bradshaw*, 787 F.2d 1385, 1390 (10th Cir. 1986) (finding a juror's prior business dealings with a key witness in the trial "does not compel an imputation of inherent bias to the juror as a matter of law") (internal quotations omitted). Absent more compelling proof of the commissioners' pecuniary interest in the outcome of their appraisal, we find Ozarks' unsubstantiated assertion insufficient to show the district court erred, or that Ozarks suffered any harm from the court's decision. *See Arkansas Louisiana Gas Co. v. Maggi*, 409 P.2d 369, 370-71 (Okla. 1965) (ruling that in condemnation proceedings, irregularities connected with the appointment of appraisers must be prejudicial to the right of a party asserting error to merit reversal).

Examining this case in retrospect, we find perhaps the district court should have gone outside the county to find citizens to serve as "disinterested" commissioners. However, for the reasons stated above, we hold the court did not abuse its discretion in appointing commissioners from Adair County. Any interest in the outcome, based upon the record, would be minuscule.

## Challenges to the Commissioners' Report

Ozarks asserts the district court erred in adopting the Commissioners' Report because it allegedly contained several mistakes in the calculation of just compensation. In order to address these claims, we first examine the process the commissioners used to calculate damages, and then address Ozarks' arguments in turn. For purposes of our review of damages established in the Commissioners' Report, we treat the report as a final jury verdict. Accordingly, we will not substitute our judgment for that of the duly appointed commissioners, and we are hesitant to disturb their report unless unsupported by competent evidence. *City of McAlester v. Delciello*, 412 P.2d 623, 627 (Okla. 1966); *Eberle v. Dep't of Highways*, 385 P.2d 868, 872 (Okla. 1963).

### 1. Damages Calculation

Before making their damages calculation, the commissioners toured the

property subject to condemnation in the presence of representatives from both Ozarks and the City of Stilwell, and consulted with experts provided by both parties. After these meetings and presentations, the commissioners met in private to assign monetary values to various factors as instructed by the district court. The commissioners ultimately calculated $1,515,000 as the amount of just compensation for the taking.

In order to calculate the final amount, the commissioners first estimated the value of facilities and properties acquired at $170,000. The commissioners adopted this figure from a document submitted by the City of Stilwell containing a detailed listing all of the facilities it planned to acquire, including the number of poles, transformers, meters, and wire. In this document, the City of Stilwell set the value of the condemned facilities and property at $295,000. The commissioners reduced this figure by forty-three percent to reflect the applicable depreciation and arrive at the final amount of $170,000.

Next, the commissioners calculated lost revenue at $1,200,000. The commissioners arrived at this figure by examining the revenue history Ozarks provided for the years 1993-1996, and computing an average annual gross revenue amount based on that data. The commissioners reduced the gross

revenue figure by seventy percent to reflect the cost of power and by an additional fifteen percent to reflect the average rate of return for utilities in Oklahoma. This left fifteen percent of the average annual income figure as net revenue. The commissioners then computed the present value of the average net revenue to arrive at $83,550. They used this amount to calculate the present value of a twenty-year income stream, assuming a growth rate of two percent and a discount rate of 5.35 percent, [8] to reach $1,200,000.

Next, the commissioners assigned a value of $26,000 for stranded costs. This amount reflects the cost to Ozarks to reconfigure its distribution facilities to provide electric service to areas left without service after the City of Stilwell's proposed expropriation of Ozarks' existing facilities. The commissioners toured the area with representatives from both the City of Stilwell and Ozarks, and found only two small areas left stranded. The commissioners adopted the $26,000 figure from the City of Stilwell's expert.

_____

[8] The 5.35 percent discount rate reflects Ozarks' average cost of borrowing. The commissioners used a two percent growth rate based on figures provided by the City of Stilwell, even though Ozarks experienced a decline in revenue through the years 1993-1996. The commissioners assumed, for the purposes of their calculation, Ozarks was entitled to the same growth rate as the City of Stilwell.

The commissioners then assigned a cost of $119,000 for reintegration. The reintegration cost reflects Ozarks' estimated cost to reconfigure their system to provide service to remaining customers around the City of Stilwell. The commissioners accepted Ozarks' estimate of this cost.

The commissioners decided to assign no amount for either the value of the territory, or the value of the going concern. The record indicates they assumed the value of the territory was included in their assessment of lost revenue and the presumed growth rate, and the commissioners deemed the going concern value inappropriate for the ultimate calculation because the City of Stilwell planned to acquire only a portion of Ozarks' facilities – not the entire service area.

2. Errors Alleged

a. Reintegration Costs and Value of Facilities Acquired

Ozarks disputes the accuracy of the Commissioners' Report for a variety of reasons. First, it argues the Commissioners' Report drastically underestimates the reintegration costs and the value of facilities and property acquired because it does not contemplate the City of Stilwell's obligation under Okla. Stat. tit. 18, § 437.2(k) to condemn all Ozarks' facilities within the corporate limits – not just the facilities it wants or needs. Specifically, Ozarks contends the City of Stilwell

-15-

must pay for two three-phase feeder lines running within the corporate limits of the city. Ozarks used these feeder lines to service customers in the newly-annexed areas of the City of Stilwell prior to the city's decision to take over the territory, and it continues to use the lines to service its customers outside the corporate limits of the City of Stilwell. The City of Stilwell does not want to condemn the feeder lines, because it already maintains parallel distribution lines running in the same area and does not need to utilize Ozarks' feeder lines to provide service to city customers. If we find Oklahoma law requires the City of Stilwell to condemn these feeder lines, the cost of reconfiguring Ozarks' power distribution facilities would rise drastically and significantly affect the calculation of damages. [9]

We disagree with Ozarks' construction of Oklahoma law and arguments on this point, and find nothing in the language of Okla. Stat. tit. 18, § 437.2(k) affirmatively requiring the City of Stilwell to take all of the electric distribution facilities within the annexed area. The statute only requires the City of Stilwell to pay Ozarks "fair value ... for the acquisition of the cooperative's electric

_____

[9] Ozarks' expert estimated the reintegration cost at $959,000 if the City of Stilwell took the feeder lines, compared to the commissioners' $119,000 calculation which did not include the added reintegration costs associated with the loss of the feeder lines.

distribution facilities *used* in furnishing electric energy in [the annexed] area."

Okla. Stat. tit. 18 §, 437.2(k) (emphasis added). Although we realize this provision of the statute is open to conflicting interpretations, common sense and equity compel us to construe it to require the city to pay only for the facilities it takes from the cooperative and *uses* to provide electric service in the condemned area. Since the City of Stilwell already maintains parallel lines to service customers in the newly-annexed area and does not need to *use* Ozarks' feeder lines, we see no reason to interpret the statute to force the City of Stilwell to condemn and pay for the unneeded lines – especially when we consider Ozarks continues to retain substantial, valuable use of the feeder lines in servicing its rural customers outside the City of Stilwell. [10]

We also agree with the district court that general principles of eminent domain law permit the City of Stilwell to select the facilities it determines are necessary for public use. *City of Cushing v. Gillespie*, 256 P.2d 418, 420 (Okla.

---

[10] We emphasize, however, if the condemnation by the City of Stilwell had rendered the feeder lines worthless or virtually worthless to Ozarks, the City of Stilwell could not have avoided paying the damages associated with taking the feeder lines by arguing it did not want or need them. Such an argument would contravene traditional principles of eminent domain. The City of Stilwell would have to compensate Ozarks for the loss. We distinguish this present case on its facts, however, because the City of Stilwell did not actually take the feeder lines, and Ozarks is left with substantial, valuable use of the facilities.

1953) (allowing a condemnor to voluntarily restrict itself to as much or as little of the property owner's interest as the public need requires); *see also United States v. 20.53 Acres of Land*, 478 F.2d 484, 487 (10th Cir. 1973) (stating how much or how little property the condemnor elects to take is a legislative, not a judicial, question and a judicial order should not expand the extent of the taking). The City of Stilwell neither needs the feeder lines to service its customers nor denies Ozarks the right to continue to use the feeder line to serve its customers outside the city limits. Therefore, we are reluctant to require the City of Stilwell to condemn and pay for the facilities.

We are similarly unpersuaded that the City of Stilwell's decision to take Ozarks' facilities and customers within the city limits will affect Ozarks' continuing legal authority to use the feeder lines to provide service to its customers. We do not read Oklahoma law to abrogate a rural electric cooperative's right to use city streets and right-of-ways for electric distribution purposes after condemnation. The City of Stilwell's decision to condemn only selected facilities inside the corporate limits of the city does not, and need not, impact Ozarks' continuing right to use the remaining feeder lines to serve its customers outside the City of Stilwell.

Because the condemnation leaves Ozarks undisturbed in its right to use the feeder lines, and Oklahoma law does not require the City of Stilwell to condemn unneeded facilities, we hold the district court did not err in adopting that portion of the Commissioners' Report pertaining to reintegration costs and the value of facilities taken.

### b.  KAMO's Revenue Losses

Ozarks also claims the commissioners' damage calculation is flawed because they failed to consider and include an amount for the revenue losses suffered by KAMO (Ozarks' power supplier) as a result of the condemnation. We disagree.  Ozarks may not seek compensation on KAMO's behalf because KAMO is not a party to this action, and even if it was a party, it lacks a compensable interest to assert.

Ozarks' argument misapplies our prior ruling in *City of Stilwell v. Ozarks Rural Elec. Coop. Corp*., 79 F.3d at 1042-43, where we affirmed the district court's denial of KAMO's request to intervene.  We based our decision in that case on our finding that KAMO held only a contingent interest in the subject of the City of Stilwell's condemnation proceedings.  As Ozarks' power supplier, KAMO stands to "benefit financially if Ozarks is allowed to continue to service

its customers in Stilwell." *Id*. at 1042. However, KAMO's contingent interest in lost revenue is only a collateral economic harm and not ordinarily a compensable property interest under general principles of condemnation law. *See State Dep't of Highways v. Bowles*, 472 P.2d 896 (Okla. 1970) (affirming the general rule that just compensation does not include damages for loss of business profits); *see also United States v. 99.66 Acres of Land*, 970 F.2d 651, 658 (9th Cir. 1992) (stating generally, only persons with ownership interests at the time of taking are entitled to compensation for a taking).[11] Since KAMO is not a party to these proceedings and has no compensable property interest at stake, we find no error in the Commissioners' Report excluding any consideration of lost revenue for purposes of calculating just compensation.

### c. Value of Lost Territory and Going Concern

Finally, Ozarks argues the district court erred in approving the calculation contained in the Commissioners' Report because it did not contain any value for loss of territory or going concern. Although it is difficult to ascertain from its brief, we assume Ozarks is treating these factors as interrelated and subsumed in

---

[11] The only reason the commissioners considered business revenue at all – even for the damages payable to Ozarks – was for the limited purpose of establishing the value of the facilities and territory the City of Stilwell condemned, not as an independent compensable interest.

the return on investment factor the commissioners deducted from their calculations. Accordingly, we consider them together.

Under Oklahoma law, "the extent of the range of inquiry to be permitted regarding the value of property taken or damaged in eminent domain proceedings, is largely in the discretion of the trial court." *Oklahoma Turnpike Auth. v. Williams*, 257 P.2d 1052, 1054 (Okla. 1953). Accordingly, we will set aside an award only if the commissioners fail to consider an element of damage for which the law entitles Ozarks to be compensated, or if we find the commissioners' appraisal is so excessive or inadequate that it shocks our sense of justice. However, we will not ordinarily substitute our judgment for that of the commissioners or set aside an award merely because it is different from the amount we would have given. If substantial evidence supports the amount of just compensation the commissioners found, and their conclusion did not result from a mistaken view of law, we will affirm the district court's adoption of the Commissioners' Report. *See Rose v. Bd. of County Comm'rs*, 241 P.2d 399 (Okla. 1952) (holding in a condemnation case if the evidence reasonably supports the verdict of the jury it will not be disturbed on appeal).

However, because the issues of the value of lost territory and going

concern were not raised below or properly preserved for appeal, we decline to reach the merits of Ozarks' claim. After a thorough examination of the record, we are unable to find where Ozarks made its argument regarding lost territory, going concern value, or return on investment in any of the proceedings before the district court. Ozarks' objections to the Commissioners' Report contain no direct claim of error with regard to these issues, nor can we find anywhere in the transcript where Ozarks argued these claims during the evidentiary hearing. In its objections to the Commissioners' Report, Ozarks included only broad, sweeping claims that the commissioners did not comply with the directions of the trial court, and that the commissioners did not consider the value of the lost territory. Such an undefined, nebulous approach to objections does not allow the district court to adequately address the parties' contentions. Indeed, the district court order confirming the Commissioners' Report contains no reference to any of the arguments Ozarks now raises on appeal, [12] presumably because Ozarks failed to articulate any answerable claim with regard to them. In light of Ozarks' apparent failure to raise these issues in its objections to the Commissioners' Report, we will not conduct a *de novo* review to consider them for the first time

[12] The district court's order addressed only: (1) whether the commissioners' appointments met the requirements of Oklahoma law, (2) whether KAMO was entitled to compensation for lost revenue, and (3) whether the commissioners assessed sufficient reintegration costs.

-22-

on appeal. *See, e.g., Walker v. Mather (In re Walker)*, 959 F.2d 894, 896 (10th

Cir. 1992) (refusing to consider an issue on appeal not raised below);

*Rademacher v. Colorado Ass'n of Soil Conservation Dists. Medical Benefits

Plan*, 11 F.3d 1567, 1571 (10th Cir. 1993) (finding issues raised, but not argued

to the district court, "ordinarily will not be considered on appeal" (citations

omitted). [13]

Even if we give Ozarks the benefit of the doubt, construe its arguments

broadly, and assume it properly argued and preserved the issues for appeal, we

find insufficient evidence on which to base any objection or change to the

Commissioners' Report. Ozarks simply argues the commissioners failed to

consider certain compensable interests. We find these unsupported claims

insufficient to allow us to make an informed assessment regarding the propriety

of the Commissioners' Report. Ozarks asks us to reverse and remand for further

proceedings but gives us no basis on which to determine whether the

commissioners actually committed some reversible error. We will not indulge in

speculation, second-guess the report of the commissioners, or reverse the district

---

[13] Ozarks discussed this issue during oral argument. However, an issue not adequately briefed will not be considered even though a party attempts to assert the claim during oral argument. *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1547 (10th Cir. 1995).

court, absent citation to record evidence, persuasive authority, or compelling argument demonstrating how or why the Commissioners' Report under-compensated Ozarks for its facilities. *See Deines v. Vermeer Mfg., Co.*, 969 F.2d 977, 979-80 (10th Cir. 1992) (if the evidentiary record is insufficient to permit assessment of appellant's claims of error, the court must affirm). Accordingly, we find the district court did not err in approving the Commissioners' Report as it pertained to the issues of lost territory and going concern values.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's confirmation of the Commissioners' Report.