**Crystal C. CONATZER, Plaintiff,**

v.

**MEDICAL PROFESSIONAL BUILDING SERVICES, INC., Defendant.**

**No. 02–CV–326–C.**

United States District Court, N.D. Oklahoma.

March 21, 2003.

Catherine Gatchell Cooper, Tulsa, OK, Thomas Lynn Bright, Mansfield, TX, for Plaintiff.

Steven Anthony Broussard, Michael Joseph Lissau, Hall Estill Hardwick Gable Golden & Nelson, Tulsa, OK, for Defendant.

### ORDER

COOK, Senior District Judge.

Pending before the Court is a motion for summary judgment filed by defendant, Medical Professional Building Service, Inc. ("MPBS") against plaintiff, Crystal C. Conatzer ("Conatzer"), pursuant to Rule 56 of the Federal Rules of Civil Procedure. Defendant contends that there exists no genuine issue of material fact and that it is entitled to summary judgment as a matter of law. After careful consideration of the party's pleadings, the summary judgment evidence, and the applicable law, the Court GRANTS summary judgment in favor of defendant on plaintiff Crystal C. Conatzer's federal law claims and, in its discretion, the Court dismisses her state law claims without prejudice.

*Statement of Facts*

For purposes of MPBS's summary judgment motion, the following facts are either undisputed or reflect the record in the light reasonably most favorable to plaintiff Conatzer, the non-moving party.

MPBS is in the business of providing security and cleaning services to medical office buildings located in the Warren Medical Buildings and other office buildings located in Tulsa and Broken Arrow, Oklahoma. MPBS's employee handbook prohibits sexual discrimination, stating that "MPBS subscribes to the principle of equal employment, prohibiting discrimination on the basis of . . . sex[.]" MPBS's employee handbook also sets forth a grievance procedure for addressing employees' discrimination complaints. The handbook defines a grievance as:

a personal concern or dissatisfaction by a non-supervisory employee with regards to administration or policies, procedures or any other aspect of the employee's working relations with MPBS. Coverage includes, but is not limited to . . . environmental working conditions . . . and allegations of bias or reprisal.

The handbook further directs aggrieved employees to take any complaints directly to management "[i]n the event the nature of the grievance is such that you feel discussion with your immediate supervisor would not serve your best interests . . ."

Plaintiff Crystal C. Conatzer began working for MPBS as a security guard in July of 2001, under the supervision of Dale Woodruff, who was chief of security at that time. Plaintiff alleges that Woodruff made numerous sexually inappropriate comments to her, both before and during her employment with MPBS. Additionally, plaintiff alleges that Woodruff engaged in several unwanted physical contacts with her. For the most part, these physical contacts consisted of relatively innocuous

pats on the back and arm. Two instances occurring in the fall of 2001, however, were of a decidedly more offensive character. On September 28, 2001, plaintiff was in the MPBS security office, discussing her shift duties with Lt. Wayne Carter ("Carter"), an MPBS supervisor. According to Carter, Woodruff entered the office "stepped up to her, kind of leaned in against her ..., and kind of rubbed against [the side of her chest] and backed away and left the office." Carter describes plaintiff's reaction to Woodruff's conduct as one of "momentary annoyance." On October 11 or 12, 2001, another more severe incident occurred in which Woodruff briefly placed plaintiff in a headlock with his knees. Jim Hamilton, an MPBS engineer, witnessed the incident and describes it in the following terms:

> While waiting for an elevator in the basement I saw Dale W[oodruff] seated in his office and Cricket [Conatzer] standing close by. They looked to be talking in a joking manner. At this time Cricket [Conatzer] bent over to pick something up or to access a lower drawer for something and Dale [Woodruff] while she was bent over placed his hand on her head or neck and directed her head towards his lap and held her there for a second or two. He then let her go and was laughing she was sort of laughing too, but she was obviously embarrassed about the ordeal.

On October 15, 2001, plaintiff spoke to Ann Lewis ("Lewis"), an MPBS security supervisor, and registered a complaint about Woodruff. Lewis instructed plaintiff to put her complaint in writing and to take the written complaint directly to management, which she did. On October 16, 2001, Tim McNulty ("McNulty"), an MPBS vice-president, began an investigation into plaintiff's complaint. Over the next few days, McNulty interviewed several of plaintiff's coworkers and instructed Woodruff not to retaliate in any way against

plaintiff. Sometime during this period Woodruff changed plaintiff's schedule to include some work on the weekends, though it is unclear whether Woodruff knew of plaintiff's sexual harassment complaint against him when he changed plaintiff's schedule. Though less desirable to plaintiff, this schedule change did not require her to work any additional hours and remained effective for approximately three weeks. MPBS suspended Woodruff with pay on October 22, 2001. At the conclusion of McNulty's investigation, MPBS found that Woodruff's actions violated MPBS's employment policies, and he was subsequently terminated and given a one-year severance package.

MPBS has also taken disciplinary action against plaintiff, though purportedly for reasons unrelated to her sexual harassment complaint. In the course of giving her deposition in this litigation, plaintiff admitted to allowing Woodruff to falsify certain aspects of her employment application to MBPS. Sometime later, MPBS issued a written reprimand to plaintiff and placed her on 90–day probation. The probationary sanction did not include any reduction in pay or hours but served as a warning that further misconduct during the probationary period could result in termination. MBPS has taken no other disciplinary action against plaintiff.

Two other incidents involving Woodruff and an employee of a physician housed in one of the buildings serviced by MPBS merit discussion here. The record is extremely sparse on these incidents but, according to Lewis' deposition testimony, an employee of Dr. Floyd Miller named Nita Long ("Long") complained to Lewis that Woodruff "had been making comments, making faces, making her very uncomfortable." Lewis further testified that Long characterized Woodruff's behavior as "flirty" and "leering." Lewis instructed

Long to report Woodruff's conduct to McNulty, and within one or two days Long informed Lewis that she had done so. According to Lewis this incident occurred sometime between August and October of 2001, but before plaintiff's October 15, 2001 complaint. McNulty has not confirmed that he ever heard from Long about this incident.

Long informed Lewis of a second incident involving Woodruff sometime shortly after plaintiff's October 15, 2001 complaint. Again, the details of this incident are unclear, but Long informed Lewis that Woodruff had entered an office in which she and her sister were taking a lunchtime nap. When Long asked why he had entered the room, Woodruff claimed that he was looking for a phone. Long stated to Lewis that Woodruff's presence made her "uncomfortable." Lewis again suggested that Long report the incident to McNulty. McNulty claims to have spoken with Long about this incident sometime immediately after plaintiff's October 15, 2001 complaint. Plaintiff has offered no evidence to controvert McNulty's claim. The record reflects no other complaints about Woodruff's behavior.

Plaintiff filed an amended petition in Tulsa County District Court on April 19, 2002, asserting the following claims against MPBS: (1) sexual harassment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII"); (2) assault and battery; (3) intentional infliction of emotional distress; and (4) retaliation. MPBS removed this action to this Court on April 25, 2002. MPBS filed its motion for summary judgment on December 10, 2002 and plaintiff responded on January 17, 2003. On January 28, 2003, MPBS filed a reply brief in support of its motion for summary judgment, and on February 13, 2003, plaintiff filed a supplemental response. A pretrial hearing was held on February 20, 2003 in which the Court considered the parties' respective trial briefs, witness lists, and pretrial motions. On March 3, 2003, MPBS filed a reply to plaintiff's supplemental response. Plaintiff then filed a second supplemental response on March 6, 2003. All matters having been fully briefed, defendant's motion for summary judgment is now ripe for the Court's consideration.

*Standard of Review*

In considering a motion for summary judgment, the Court "has no real discretion in determining whether to grant summary judgment." *U.S. v. Gammache,* 713 F.2d 588, 594 (10th Cir.1983). The Court must view the pleadings and documentary evidence in the light most favorable to the nonmovant, *Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526, 527–28 (10th Cir.1994), and summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Akin v. Ashland Chemical Co.,* 156 F.3d 1030, 1034 (10th Cir.1998). " '[T]he moving party carries the burden of showing beyond a reasonable doubt that it is entitled to summary judgment.' " *Hicks v. City of Watonga,* 942 F.2d 737, 743 (10th Cir.1991) (quoting *Ewing v. Amoco Oil Co.,* 823 F.2d 1432, 1437 (10th Cir.1987)). However, once the moving party meets its burden, the burden then shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter. *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991). The "party opposing a properly supported motion for summary judgment

may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted).

*Discussion*

A. *Title VII*

 Title VII makes it unlawful "for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §§ 2000e–2(a)(1). Sexual harassment is a form of gender discrimination actionable under Title VII. *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Workplace sexual harassment may take either of two forms: 1) "quid pro quo" harassment, which consists of promises of favorable treatment or threats of unfavorable treatment calculated to coerce an employee into submitting to unwelcome sexual advances; or 2) "hostile work environment" harassment, which consists of offensive gender-based conduct that is "severe or pervasive enough to create an objectively hostile or abusive work environment" and is subjectively perceived by the victim to be abusive. *Deters v. Equifax Credit Information Services, Inc.,* 202 F.3d 1262 (10th Cir.2000) (quoting *Harris v. Forklift Sys.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Although plaintiff's amended complaint alleges both quid pro quo and hostile work environment sexual harassment, plaintiff has offered no evidence whatsoever that Woodruff conditioned any favorable treatment on plaintiff's submission to his physical assaults or that he explicitly or implicitly threatened plaintiff with unfavorable treatment if she refused to submit to his physical assaults. The Title VII claim in this case is there-fore appropriately characterized solely as a hostile work environment claim.

 In order to set forth a prima facie case of hostile work environment sexual harassment, plaintiff must show that: (1) she is a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based upon sex; (4) the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) the sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive, and the victim, in fact, did perceive it to be so; and (6) some basis for employer liability has been established. *Meritor,* 477 U.S. at 65–73, 106 S.Ct. 2399. Here, defendant asserts in its motion for summary judgment that plaintiff has failed to establish a basis for employer liability. The Court's analysis will therefore focus on this element of plaintiff's Title VII claim.

1. *Employer's Vicarious Liability*

 An employer is subject to vicarious liability for a victimized employee's actionable hostile environment claim if the claim arises from the actions of a supervisor with immediate—or successively higher—authority over the employee. *Burlington Industries v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). A defendant employer may, however, avoid vicarious liability for the misconduct of a supervisor in a Title VII hostile environment case by establishing that it is entitled to the affirmative defense set forth in the Supreme Court's holdings in *Ellerth* and *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). The defense is comprised of two necessary elements: (a) that the employer exercised reasonable care to

prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275. If a supervisor takes a tangible employment action against the subordinate employee based on the subordinate's response to unwelcome sexual demands, however, the employer cannot raise the affirmative defense. *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257.

■ In an effort to circumvent the Ellerth/Faragher affirmative defense, plaintiff argues that Woodruff's assaults were, in themselves, tangible employment actions. This argument obviously lacks merit. If sexually harassing behavior by a supervisor could, in itself, be construed as a tangible employment action, the affirmative defense set forth in *Ellerth* and *Faragher* would be a dead letter. That is, every case involving sexual harassment by a supervisor would also involve a tangible employment action and would therefore preclude resort to the affirmative defense. Assuming the Supreme Court does not intend its rulings to lack all force and effect, this Court declines to adopt plaintiff's interpretation of "tangible employment action."

■ Plaintiff also contends that Woodruff subjected her to a tangible employment action when he changed her schedule immediately following her sexual harassment complaint. Plaintiff argues that this schedule change was adverse to her because it limited her ability to see her son. Unlike the argument previously discussed, this assertion bears some similarity to a viable claim. However, as a matter of law, Woodruff's schedule change does not rise to the level of a tangible employment action as that phrase is defined in *Ellerth*. In that case the Supreme Court defined a tangible employment action as a "signifi-cant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," usually resulting in a direct economic harm. *Ellerth*, 118 S.Ct. at 2261, 118 S.Ct. 2257. The schedule change that plaintiff seeks to construe as a tangible employment action had no effect on plaintiff's gross pay or hourly rate of pay and did not affect her job duties in any respect. The schedule change merely required her to work on the weekends and to work one "rollover" shift, that is, a shift separated from the previous shift by only eight or nine hours. Moreover, the schedule change was temporary, remaining in effect for only three weeks. While the Court recognizes that schedule changes of this nature may have more or less significant effects on different individuals depending on their circumstances, this does not alter the significance of the employment action itself. Therefore, plaintiff's inability to see her son as much as she wished as a result of this schedule change does not thereby elevate it to a tangible employment action.

■ Plaintiff also seeks to circumvent the *Ellerth/Faragher* affirmative defense by arguing that she suffered tangible employment actions by MPBS. Specifically, plaintiff identifies the following "tangible employment actions": (1) MPBS provided Woodruff with a generous severance package; and (2) MPBS placed plaintiff on 90–day probation after it discovered she had made false representations in her employment application. Plaintiff's argument is fundamentally flawed because it misses the point of the "tangible employment action" analysis, that is, to determine whether sexually harassing behavior on the part of the supervisor may be imputed to the employer. The actions of MPBS are only relevant in this context to the extent that they

aided Woodruff, as an agent of MPBS, in committing the sexually harassing acts. Even assuming that MPBS took these actions to retaliate against plaintiff for her sexual harassment complaint, these actions cannot be construed as having aided Woodruff in committing the sexual harassment since they both took place either as Woodruff was being terminated or sometime thereafter. Therefore, because plaintiff has not, as a matter of law, established any tangible employment actions, MPBS is entitled to raise the *Ellerth/Faragher* affirmative defense.

### a. *Employer's Reasonableness*

 To satisfy the first prong of the *Ellerth/Faragher* affirmative defense, defendant must demonstrate that it exercised reasonable care to prevent and promptly correct any sexually harassing behavior. *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275. Depending on the employment context, proof that an employer has promulgated an antiharassment policy with a complaint procedure may be sufficient for the employer to show that it has taken reasonable care to prevent harassment. *Id.* It is undisputed that defendant had a policy against sexual harassment and a grievance procedure that permitted employees to take their complaints directly to management. Furthermore, it is undisputed that MPBS's antiharassment policy is posted in all break rooms, including the one directly behind the security office, which plaintiff admits to having frequented.[1] Plaintiff argues that MPBS's anti-harassment policy and grievance procedure were deficient in several respects. Plaintiff relies principally on guidelines promulgated by the Equal Employment Opportunity Commission ("EEOC") to demonstrate these alleged deficiencies. EEOC guidelines, however, are just that, guidelines. An employer need not follow EEOC guidelines in order to establish a reasonably effective antiharassment policy and grievance procedure. Although MPBS's antiharassment policy and grievance procedure are not models of specificity, it is undisputed that they fulfill at least two key functions. First, MPBS's antiharassment policy clearly prohibits discrimination on the basis of sex. Second, MPBS's grievance procedure provides a means by which an aggrieved employee can take her complaint directly to higher management. The Court thus finds, as a matter of law, that MPBS's antiharassment policy and grievance procedures were reasonably calculated to prevent sexually harassing behavior.

 Plaintiff also argues, however, that MPBS failed to take reasonable steps to prevent or correct harassment because it did not respond to two prior incidents involving Woodruff's alleged misconduct toward Nita Long. Plaintiff offers evidence of these two prior incidents through the deposition testimony of Ann Lewis. Although Lewis' testimony presents some serious hearsay questions, the Court need not address them because it finds that even assuming plaintiff would elicit this

---

1. Plaintiff does not dispute this fact but argues that it should be stricken from the record because it is presented through the affidavit of Tim McNulty, an MPBS vice-president, and is, therefore, a self-serving and conclusory averment, which the Court should not consider on summary judgment. The applicable rule here is Fed.R.Civ.P. 56(e), which states in relevant part: "Supporting ... affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." As a vice-president, involved in MPBS's day-to-day operations, McNulty is clearly competent to testify—from personal knowledge—to the posting of MPBS's anti-harassment policy in employee breakrooms. That the averred fact is favorable to the affiant does not thereby make it "self-serving and conclusory."

testimony from the declarant or that Lewis' testimony could be admitted under an exception to the hearsay exclusion, the evidence cannot support a finding that MPBS was required to take corrective action. In her deposition Lewis states, after being prompted by plaintiff's counsel, that Long considered Woodruff's actions as "leering" and that they made her "uncomfortable." As described by Lewis, Woodruff's conduct toward Long may have been unprofessional, but it was far from harassing. Even assuming MPBS management had full knowledge of Woodruff's conduct toward Long, this would not have created a duty under Title VII to take corrective action. Mere unprofessional conduct, even if imbued with sexual or romantic overtones, is simply not the kind of conduct that gives rise to such a duty. In *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998), the Supreme Court emphasized that Title VII:

> does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex. The prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the "conditions" of the victim's employment.

The Court thus concludes that no reasonable juror could find that Woodruff's behavior toward Long created a duty on the part of MPBS to take corrective action.

 Plaintiff also contends that MPBS failed to take reasonable steps to prevent sexual harassment that occurred after the September 28, 2001 incident in which Woodruff rubbed his chest against that of the plaintiff. Plaintiff argues that the September 28, 2001 incident placed MPBS on notice of Woodruff's harassing conduct and created an immediate duty on the part of MPBS to take corrective action, which it failed to do. However, although Wayne Carter, an MPBS supervisor, witnessed the September 28, 2001 incident, this alone does not establish sufficient notice to trigger a duty on the part of MPBS to take preventative measures. Plaintiff did not complain to Carter about the incident, nor did she in any way indicate that she expected Carter to report it to management. Absent some complaint, formal or otherwise, this isolated incident cannot, as a matter of law, provide adequate notice to MPBS of a hostile work environment requiring prompt corrective action. *See Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290 (11th Cir.2000)(finding that a manager's knowledge of two isolated incidents involving inappropriate physical contact was not sufficient in itself to indicate that the manager should have known that the harasser was engaging in a consistent pattern of harassment toward the victim, nor was it sufficient to create a reasonable expectancy that the manager would take corrective action against the harasser); *Coates v. Sundor Brands, Inc.*, 164 F.3d 1361 (11th Cir.1999)(finding that the employer did not have actual or constructive notice of sexual harassment where the victim provided a manager with a copy of a note from the harasser containing a romantic proposition but made no specific complaint about the note).

Plaintiff cites *Lockard v. Pizza Hut*, 162 F.3d 1062 (10th Cir.1998), *Baker v. Weyerhaeuser*, 903 F.2d 1342 (10th Cir.1990), and *Bales v. Wal–Mart Stores, Inc.*, 143 F.3d 1103 (8th Cir.1998) for the proposition that "when even a low level supervisor learns of sex harassment in the workplace the employer becomes liable if it does not immediately implement reasonable corrective action." But plaintiff interprets the holdings in these cases too broadly. In each of these cases the victim communicated a clear complaint to the "low-level"

supervisor. The supervisor did not merely witness behavior that the victim later characterized as sexually harassing, but was told by the victim that she was being harassed. Contrary to plaintiff's interpretation, the cases cited thus hold that a complaint *that is communicated* to a low-level supervisor is imputed to higher management for purposes of determining whether the employer knew of the harassing behavior. In the instant case, plaintiff communicated no complaint about the September 28, 2001 incident to anyone prior to the October 11, 2001 incident. Therefore no reasonable juror could find that this isolated incident placed MPBS on notice of a hostile work environment merely because the incident was witnessed by an MPBS supervisor.

Once MPBS received plaintiff's first and only complaint on October 15, 2001, the evidence clearly demonstrates that MPBS responded in a prompt and reasonable manner. MPBS vice-president Tim McNulty began an investigation the day after receiving plaintiff's complaint. Over the course of McNulty's investigation he interviewed the following individuals: (1) Jim Hamilton, the MPBS engineer who witnessed the October 11, 2001 incident; (2) Wayne Carter, the MPBS security supervisor who witnessed the September 28, 2001 incident; (3) Dale Woodruff, the alleged harasser; (4) Billy Kern, an MPBS security supervisor; and (5) Elaine Kern, an MPBS housekeeping supervisor. Tom Cooper, President of MPBS, also took part in a number of these interviews. McNulty also called Woodruff on October 17, 2001 to instruct him not to take any retaliatory action against plaintiff. Plaintiff suffered no further harassment after her complaint. McNulty's investigation culminated in Woodruff's suspension on October 22, 2001, four business-days after plaintiff's complaint.

Based on the facts discussed above, which are either undisputed or stated in the light most favorable to plaintiff, the Court finds MPBS exercised reasonable care to prevent sexual harassment as a matter of law. There being no genuine issue of material fact regarding this issue, defendant satisfies the first prong of the *Ellerth/Faragher* affirmative defense.

### b. *Employee's Unreasonableness*

To satisfy the second prong of the *Ellerth/Faragher* affirmative defense, defendant must demonstrate that plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Ellerth,* 524 U.S. at 742, 118 S.Ct. 2257. As the Supreme Court noted in *Ellerth,* proof that an employee failed to use any complaint procedure provided by the employer "will normally suffice to satisfy the employer's burden under the second element of the defense." *Id.* Here, plaintiff did not complain about Woodruff's conduct until October 15, 2001, seventeen days after the first significant incident on September 28, 2001. Though a plaintiff can rebut a defendant's affirmative defense and create an issue of fact with evidence that she behaved reasonably under the circumstances, plaintiff has produced no such evidence in this case. The record can support only one conclusion regarding plaintiff's inaction, that is, she unreasonably failed to take advantage of any preventive or corrective opportunities provided by MPBS.

Because defendant MPBS has satisfied both prongs of the *Ellerth/Faragher* affirmative defense, it cannot be held vicariously liable for the sexual harassment caused by one of its employees as a matter of law.

### 2. *Employer's Negligence Liability*

Plaintiff also alleges that MPBS was negligent in allowing Woodruff

to engage in sexual harassment. The Supreme Court recognized in *Faragher* and *Ellerth* the continuing validity of negligence as a separate basis for employer liability under Title VII. *See Wilson v. Tulsa Junior College,* 164 F.3d 534, 540–41 n. 4 (10th Cir.1998). Under this theory of employer liability, plaintiff must establish that "the employer had actual or constructive knowledge of the hostile work environment but did not adequately respond to notice of the harassment." *Harrison v. Eddy Potash, Inc.,* 112 F.3d 1437, 1444 (10th Cir.1997). The Tenth Circuit has also held that, in this context, employer negligence consists of "failing to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known." *Hirschfeld v. New Mexico Corrections Dep't,* 916 F.2d 572, 577 (10th Cir.1990). Although many of the same facts are relevant to both negligence and vicarious liability claims, in asserting that an employer was negligent the plaintiff bears the burden of establishing that the employer's conduct was unreasonable, while in a vicarious liability claim the employer bears the burden of establishing—as an affirmative defense—that it exercised reasonable care to prevent harassment. In any event, as discussed at length regarding the first prong of MPBS's affirmative defense, MPBS did not have actual or constructive notice of Woodruff's harassing conduct prior to plaintiff's October 15, 2001 complaint. Furthermore, MPBS promulgated an anti-harassment policy and complaint procedure reasonably calculated to prevent sexual harassment. And finally, MPBS took reasonably prompt and effective measures to correct the allegedly hostile work environment once it was notified of Woodruff's conduct. Therefore the Court finds that plaintiff's negligence claim fails as a matter of law.

B. *State Law Claims*

The court has jurisdiction over the state law claims only through the exercise of its supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c). Pursuant to 28 U.S.C. § 1367(c)(3), a district court has discretion to decline to exercise supplemental jurisdiction once it has dismissed the claims over which it had original jurisdiction. *Panis v. Mission Hills Bank,* 60 F.3d 1486 (10th Cir.1995). Relevant considerations include judicial economy, convenience, fairness, and comity. The strongest consideration here is that state courts are more familiar with, and better equipped to address, the remaining state law causes of action. The Court therefore exercises its discretion and declines supplemental jurisdiction over the remaining claims. Accordingly, the Court dismisses without prejudice Conatzer's state law claims against MPBS.

ACCORDINGLY, IT IS THE ORDER OF THE COURT that the motion for summary judgment of defendant Medical Professional Building Services, Inc. is GRANTED.

IT IS THE FURTHER ORDER OF THE COURT that plaintiff Crystal C. Conatzer's state law claims against MPBS are dismissed without prejudice.

IT IS THE FURTHER ORDER OF THE COURT that all other pending motions in this matter are deemed MOOT as a result of this Order. Judgment will issue by separate document as required by Fed.R.Civ.P. 58.

IT IS SO ORDERED this __ day of March, 2003.